THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: June 18, 2009



Honorable Pamela Pepper
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF WISCONSIN

---

| | | |
|---|---|---|
| IN RE: | NORA BARBOSA, | Case No. 07-24533 -PP |
| | Debtor. | Chapter 7 |

---

JOHN SCAFFIDI, TRUSTEE,

                    Plaintiff,

vs.                                                    Adv. No.  08-2056-pp

ENRIQUE BARBOSA,

                    Defendant.

---

### MEMORANDUM DECISION AND ORDER GRANTING THE PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT, DECLARING AVOIDABLE THE JUNE 15, 2007 QUIT-CLAIM DEED, DECLARING AVOIDABLE THE FEBRUARY 3, 2005 TRANSFER OF ASSETS, AND ORDERING FURTHER PROCEEDINGS

---

The plaintiff–the Chapter 7 trustee in the debtor's bankruptcy case–filed this adversary proceeding to avoid the debtor's transfer to her ex-husband (the defendant) of her interest in their homestead and several other assets in their divorce.  During the

1

pre-trial proceedings in this adversary, the defendant failed to comply with several of this Court's orders, and as a sanction, the Court struck his answer to the complaint. Accordingly, the plaintiff filed a motion for default judgment. For the reasons that follow, the Court grants the plaintiff's motion insofar as it asserts that the June 15, 2007 quit-claim deed the debtor signed post-petition was void, and insofar as it asserts that the transfer of assets accomplished by the debtor's signing of the February 3, 2005 Marital Settlement Agreement, incorporated into the March 9, 2005 divorce judgment, constituted a transfer in constructive fraud of her creditors. The Court orders further proceedings, however, to determine the value recoverable by the plaintiff.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

The debtor and the defendant were married on February 15, 1979, and were divorced on February 3, 2005. (Ex. 1 at 1-2.) On March 9, 2005, the Family Court Branch of the Milwaukee County Circuit Court issued Findings of Fact, Conclusions of Law, and a Judgment of Divorce that incorporated a Marital Settlement Agreement ("MSA") signed by both parties and filed with the court on February 3, 2005. (*See* Ex. 1 at 2, 4-6.)

#### 1. The Facts Surrounding the Transfer of the Homestead to the Defendant

The MSA stated that both the debtor and the defendant were to keep, as their individual property, "everything" in their respective possessions at the time of the divorce hearing, including all "financial assets." (Ex. 1 at 4 ¶ IV.) The MSA also stated that defendant would retain "the marital home" and that "[t]he mortgage on the home

2

. . . [would] be assumed by the [defendant] and titled in his name only." (Ex. 1 at 4 ¶ IV.)

Although the 2005 MSA awarded the marital homestead property to the defendant, the debtor failed to execute any deed or title document turning her interest in the property over to him. On March 4, 2007, therefore, the defendant filed a contempt motion in family court, seeking to compel the debtor to sign over to him her interest in the homestead. The family court scheduled that motion for a hearing on June 15, 2007. On June 12, 2007, before the hearing could take place, the debtor filed for bankruptcy. Nonetheless, on June 15, 2007, the Milwaukee County Circuit Court proceeded with the contempt hearing, and the debtor signed a quit-claim deed in court that transferred her interest in the homestead property to the defendant. After the debtor signed the deed, the defendant withdrew the motion for contempt.

2. <u>The Facts Surrounding the Transfer of Certain Other Assets to the Defendant</u>

After the divorce, Wisconsin's Office of Lawyer Regulation ("OLR") had occasion to investigate the conduct of the attorney who had represented the debtor and the defendant in the family court proceedings. During the OLR investigation, the defendant admitted that "he removed $110,000.00 from his [employee savings plan] during the pendency of the [divorce] action and that $80,000.00 remained in an account he controlled at the time of the divorce on February 3, 2005." (Ex. 2 at 11, ¶ 14.) The OLR investigator noted, however, that the MSA did not list this money, or divide it between the parties. (Ex. 2 at 11, ¶ 14.)

3

In addition, the OLR investigator subpoenaed the defendant's financial records, and learned of yet more assets that had not been specifically mentioned in the MSA. The investigator's report indicated:

> The records subpoenaed from Fidelity Investment and the parties' 2004 federal income tax returns show the following for calendar year 2004, $303,261.81 was withdrawn from [the defendant's] retirement accounts; $281,039.00 from his pension and $22,222.00 from his IRA; $158,000.00 was rolled over into another retirement account which had not been divided between the parties. $26,830.13 was withheld for federal taxes and $118,431.68 was given to [the defendant] and has never been accounted for. . . .

(Ex. 2 at 17.)

The OLR investigation led to a disciplinary hearing before the Wisconsin Supreme Court, *see* In re Disciplinary Proceedings Against Gamino, 753 N.W.2d 521 (Wis.2008), which ultimately resulted in suspension of the attorney's license. In the fact section of its opinion, the Wisconsin Supreme Court noted that the attorney, while initially agreeing to represent both the debtor and defendant, ended up representing only the defendant's interests. The Court agreed with the referee's finding of fact that the "marital settlement agreement did not include all of the assets listed in the joint financial disclosure and the list of assets" prepared by the defendant. Id. at 525. The Court held that the divorce attorney had failed to "[a]ddress the division of [the defendant's] pension, savings plan and other retirement savings in the marital settlement agreement," id. at 525, and had failed to discharge his duty of loyalty to the debtor because "he was obligated to disabuse [the debtor] as to the patently unfair divorce agreement that was being offered to the court." Id. at 527-28.

4

B.    **Procedural Background**

1.    <u>The Allegations in the Adversary Complaint</u>

In his complaint, the plaintiff articulated three causes of action.

(1) In the portion of the complaint entitled "Cause of Action Under Section 549 of the Bankruptcy Code,"[1] the plaintiff alleged that 11 U.S.C. § 549 authorized him to avoid the transfer the debtor made via the June 15, 2007 quit-claim deed, because (a) the debtor made this transfer post-petition, and (b) the transfer was not authorized by the Bankruptcy Code.  (Compl. at 1-2)

(2) In the portion of the complaint entitled "Cause of Action for Violation of the Automatic Stay," the plaintiff alleged that the automatic stay went into effect when the debtor filed her Chapter 7 petition, that the "real estate"–the homestead–became property of the bankruptcy estate at that same time, and that the transfer of the "real estate" via the quit-claim deed after the petition date was "void" because the defendant obtained that transfer in violation of the stay.  (Compl. at 2)

(3) In the portion of the complaint entitled "Cause of Action Alleging a Transfer in Fraud of Creditors," the plaintiff argued that the MSA effected the transfer to the defendant of retirement funds, cash, savings accounts and real estate, without the debtor receiving a "reasonably equivalent value" in exchange.  (Compl. at 2-3, ¶ 11) The plaintiff further alleged that the debtor transferred these assets with the "actual

---

[1]  The plaintiff filed what is essentially a three-count complaint.  He did not, however, number the counts, so this decision refers to the allegations by the titles he gave them.

5

intent" to hinder, defraud or delay her creditors. (Compl. at 2, ¶ 11) He alleged that at the time of the transfer, the debtor either was insolvent, or became insolvent as a result of the transfer, and that the debtor should have believed that the transfer would result in her incurring debts beyond her ability to pay. (Compl. at 3, ¶ 11) Finally, he alleged that, at the time of the transfer, there were "creditors of the debtor in existence whose claim arose before and there are [sic] creditors of the debtor in existence after the transfer was made." (Id.) For all of these reasons, he argued that the asset transfers that resulted from the MSA constituted transfers in fraud of creditors in violation of Wis. Stat. §§ 242.04(1) and 242.05(1), voidable under §544(b)(1).

2.     The Relief the Plaintiff Requested

In the complaint itself, the plaintiff requested the following relief:

> plaintiff prays for judgment declaring the transfer of the real estate to be of no effect and preserving that interest for the benefit of the bankruptcy estate and for judgment against the defendant for the property transferred and/or the value of the same and in such an amount so as to equate to a reasonably equivalent value with respect to the 2005 marital settlement/judgment described in the complaint above and for such other relief as might be equitable and just.

(Compl. at 3) He also asked, under the heading "Cause of Action for Violation of the Automatic Stay," that this Court order the transfer of the homestead to the defendant "expunged" from the records of the Milwaukee County Register of Deeds. (Compl. at 2, ¶ 8)

In the motion for default judgment, the plaintiff requested "Default Judgment against the Defendant as follows: 1. $98,000.00; 2. [$]59,215.50; [and] 3. Voiding the quit-claim deed and vesting title to ½ of the transferred real estate in the Bankruptcy

6

Estate of [the debtor], John M. Scaffidi, Trustee." (Pl.'s Mot. for Default, ¶ 9) More specifically, the motion requested (1) that the Court void the quit-claim deed issued on June 15, 2007 and vest title to one-half of the homestead in the estate; (2) that the Court award the estate a judgment in the amount of $98,000; and (3) that the Court award the estate a judgment in the amount of $59,215.50, which, the plaintiff alleged, represented one-half of the significant cash withdrawals the defendant made from his retirement account in 2004.

At oral argument on the motion for default, the plaintiff modified his request for relief. First, he orally withdrew his request for a judgment in the amount of $98,000, stating that he had concluded upon further investigation that the $98,000 payment would have been exempt from the bankruptcy estate. (Electronic Recording of Hearing at 2:23:00 - 2:23:12)

Second, he made a new request, for an order of judgment in the amount of $40,000. During the OLR investigation, the defendant had admitted that "he removed $110,000 from his [employee savings account] during the pendency of the [divorce] action and that $80,000.00 remained in an account he controlled at the time of the divorce on February 3, 2005." (Ex. 2 at 11, ¶ 14) Counsel for the plaintiff stated, "What I asked for initially - basically what we're asking for is one-half of the [$80,000.00], and the $59,000, and the voiding of the deed." (Electronic Recording of the Hearing at 2:32:35 - 2:32:54)

Third, as discussed in further detail in section B(3) below, the plaintiff abandoned his request for a one-half interest in the homestead property.

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 7 of 45

3.    <u>The Defendant's Actions During the Adversary Proceeding</u>

During the pretrial proceedings, the defendant failed to comply with several discovery requests.  At the outset of the case, the plaintiff issued interrogatories, requests for admissions, and requests for the production of documents.  At a pretrial hearing on July 14, 2008, the plaintiff's attorney informed the Court that the defendant had returned the requests for admissions, but had not responded to the interrogatories or the requests for production of documents.  (Docket No. 7)  Accordingly, the Court issued an order requiring the defendant to comply with the discovery requests by 5:00 p.m. on July 31, 2008.  (Docket No. 10)  The order stated that if the defendant failed to comply, he would be required to appear before the Court and show cause as to why it should not impose sanctions against him.  (Docket No. 10)  The defendant failed to comply with the discovery requests.  (Docket No. 12)  The Court issued an order to show cause, scheduling the hearing for August 20, 2008.  (Docket No. 13)

At the show-cause hearing, the plaintiff's attorney stated that on August 14, 2008, he had received answers to his requests for admissions and requests for production related to those admissions, but that he had not received answers to his interrogatories or responses to his requests for production of documents related to the interrogatories.  (Docket No. 16) He asked the Court to sanction the defendant for his failure to comply with the discovery requests by striking the defendant's answer to the complaint.  The defendant's attorney responded that the defendant had answered the interrogatories, that defense counsel had received those answers from his client on August 14, 2008 and that he had them in Court with him.  He argued that the

8

plaintiff's attorney should have contacted him if the plaintiff believed that the defendant's answers were incomplete.

The Court's order had required the defendant to respond to the discovery requests, in full, by 5:00 p.m. on July 31, 2008, and the Court concluded that the defendant had not complied with that order. As a sanction, it ordered the defendant to pay the plaintiff's reasonable costs and attorneys' fees incurred as a result of that non-compliance. The Court then adjourned the hearing, to allow the plaintiff's attorney to review the answers to the interrogatories.

At the adjourned hearing, the plaintiff's counsel reported that he had not received any documents since the last hearing. (Docket No. 17) He gave the Court and the defendant a list of all of the information that the defendant had failed to provide in his August 14, 2008 answers to the interrogatories. The defendant's attorney conceded that he had not spoken with his client since the August 20 hearing, and that he had not forwarded any further documents to the plaintiff's counsel. The plaintiff renewed his request for sanctions, again asking the Court to strike the defendant's answer. The Court held that the defendant deliberately was refusing to follow the Court's orders, and sanctioned the defendant by striking his answer from the record. (Docket No. 18)

The plaintiff filed a motion for default judgment on October 31, 2008. (Docket No. 20) The defendant objected to the motion for default, and the plaintiff filed a reply brief. (Docket Nos. 21 and 26) The parties presented oral argument on the motion, and the Court took the matter under advisement.

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 9 of 45

## II. <u>LEGAL ANALYSIS</u>

**A.** **The Defendant Has A Limited Ability To Attack The Motion For Default Judgment.**

To succeed on his motion for default, the plaintiff must prove a *prima facie* case for each of the three causes of action alleged in the complaint. <u>In re Jarosz</u>, 322 B.R. 662, 670 (Bankr. E.D.Wis. 2005). A *prima facie* case is " [a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." <u>Black's Law Dictionary</u> 551 (2d Pocket Ed. 2001).

In light of the fact that this Court struck the defendant's answer to the complaint, the question is whether the defendant has any defense against the motion for default judgment. The answer is yes, but that that defense is limited.

In <u>In re Phillips</u>, 379 B.R. 765, 790-91 (Bankr. N.D.Ill. 2007), the bankruptcy court for the Northern District of Illinois issued an order striking all of the defendant's pleadings and finding her in default. In discussing the effect of that order, the court noted that "[a]s a result of the Court striking [the defendant's] answer and affirmative defenses, she has admitted the allegations in the Trustee's amended complaint . . . [and] all of the Trustee's exhibits have been admitted into evidence without objection." <u>Id.</u> at 791.

Accordingly, the Court deems that the defendant has admitted all of the plaintiff's factual allegations. The defendant, however, can challenge the sufficiency of the evidence–that is, he can challenge whether all of the facts the plaintiff has

10

alleged are sufficient to prove the elements of each of the causes of action alleged in the complaint.  In <u>In re Jarosz</u>, Judge Kelley explained:

> Generally, when default is entered, the defaulting party loses standing to contest the truth of the facts alleged in the complaint. 10 *Moore's Federal Practice-Civil* § 55.12. But a party may challenge the *sufficiency* of the facts alleged in the complaint. *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir.1994) (entry of default does not preclude a party from challenging the sufficiency of the complaint). *See Boonville Convalescent Center, Inc. v. Sherwood Healthcare Corp.*, 2004 WL 1629512, at *3, 2004 U.S. Dist. LEXIS 13969, at *10 (S.D.Ind. May 18, 2004) (citing *Black*, noting that a Fed.R.Civ.P. 12(b)(6) analysis is necessary prior to entry of a default judgment). Therefore, at the . . . hearing, the [plaintiff] was required to prove all the elements of a *prima facie* case under [the alleged cause of action], and [the defendant] was limited to challenging whether all the elements of [that cause of action] were met. Defenses which may have been available were foreclosed by [the defendant's] failure to timely answer the complaint.

322 B.R. at 670.

Seventh Circuit law supports Judge Kelley's reasoning.  In <u>Black v. Lane</u>, the Seventh Circuit stated:

> When a default judgment is entered, facts alleged in the complaint may not be contested. *See Thomson v. Wooster*, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885); *see also* Fed.R.Civ.P. 8(d) ("Averments in a pleading to which a responsive pleading is required ... are admitted when not denied in the responsive pleading."). Furthermore, "[a]s a general rule, a default judgment establishes, as a matter of law, that defendants are liable to plaintiff as to each cause of action alleged in the complaint." *United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir.1989). The entry of a default order does not, however, preclude a party from challenging the sufficiency of the complaint. *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir.1988), *cert. denied*, 493 U.S. 858, 110 S.Ct. 168, 107 L.Ed.2d 124 (1989).

22 F.3d 1395, 1399 (7th Cir. 1994).

11

In the case at bar, then, the defendant may defend against the motion for default only to the extent that he can attack the sufficiency of the facts the plaintiff has presented to prove the elements of each the three causes of action the plaintiff has alleged. The Court, therefore, must look at the elements of each of those causes of action, and–accepting as uncontested the facts the plaintiff presented in support of each–must determine whether the plaintiff has presented a *prima facie* case proving each of the three.

B. **The Plaintiff Can Avoid the June 15, 2007 Quit-Claim Deed as an Unauthorized, Post-Petition Transfer and as a Transfer in Violation of the Automatic Stay.**

1. <u>The uncontested facts prove a *prima facie* case for the plaintiff's first cause of action–his allegation that the quit-claim deed constituted an unauthorized, post-petition transfer which he can avoid under 11 U.S.C. § 549(a).</u>

The plaintiff's first cause of action alleges that the June 15, 2007 quit-claim deed constituted an unauthorized, post-petition transfer of property of the estate, which 11 U.S.C. § 549(a) authorizes him to avoid. Section 549 states that "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court." In order to prove a *prima facie* violation of § 549(a), then, the trustee must prove (1) that there was a transfer (2) of property of the estate (3) which occurred after the case commenced, and (4) which was not authorized by the Bankruptcy Code or by the Court.

As discussed above, the Court accepts as true the facts the plaintiff alleged. There is no question that the debtor filed her petition on June 12, 2007, and that "all

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 12 of 45

legal or equitable interests" that she had in "property" as of that date became the property of the bankruptcy estate the moment she filed. *See* 11 U.S.C. § 541(a)(1). There appears to be no question that everyone from the debtor to the defendant to the family court judge believed that the whole point of the debtor signing the quit-claim deed on June 15, 2007 was for the debtor to "transfer" some interest to the defendant. That transfer occurred *after* the debtor filed her petition; in his objection to the motion for default judgment, the defendant conceded as much, stating "[t]here is no question that the Quit Claim Deed was executed after the initiation of the automatic stay . . . ." (Def.'s Mem. in Opp. at 3). Finally, it is undisputed that neither the Bankruptcy Code nor this Court authorized the debtor to make this transfer.

Accordingly, the plaintiff has made a *prima facie* case proving that by signing the quit-claim deed on June 15, 2007, the debtor executed an unauthorized, post-petition transfer of an interest belonging to the estate. Accordingly, the Court finds that the plaintiff can avoid the transfer effectuated by the June 15, 2007 quit-claim deed.

2.   The uncontested facts prove a *prima facie* case for the plaintiff's second cause of action–his allegation that the defendant obtained the interest transferred by the quit-claim deed in violation of the automatic stay.

In his second cause of action, the plaintiff alleges that the defendant obtained whatever interest that the debtor transferred via the quit-claim deed in violation of the automatic stay.

As discussed above, § 541(a)(1) provides that "all legal or equitable interests of the debtor in property as of the commencement of the case" becomes the property of the

13

bankruptcy estate once the petition is filed. Section 362(a)(3) states that the petition "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

The combined effect of these two statutes is that on June 12, 2007–the day the debtor filed her Chapter 7 petition–her bankruptcy estate included any interest that she retained in the homestead as of that date, and the automatic stay that went into effect that day should have prevented anyone from taking any action to obtain that interest. In spite of this fact, however, the debtor was hailed into state court in response to the defendant's motion to compel three days later–while the stay was in effect–where she signed the quit-claim deed. The defendant did not seek relief from the stay between June 12 (the petition date) and June 15 (the date the debtor signed the quit-claim deed). Thus, the plaintiff argued that the defendant violated the stay when he obtained the interest the debtor transferred via that deed.

Again, the defendant conceded this point in his objection to the motion for default judgment, stating, "There is no question that the Quit Claim Deed was executed after the initiation of the automatic stay, and as such is void." (Def.'s Mem. in Opp. at 3) Thus, the plaintiff has made an unopposed, *prima facie* case that the defendant obtained through the June 15, 2007 quit-claim deed whatever interest the estate had in the homestead in violation of the automatic stay.

14

3. While the plaintiff has succeeded in avoiding the June 15, 2007 transfer, and has established that the defendant obtained the interest that was transferred in violation of the automatic stay, it is not clear what benefit this result yields for the estate.

The plaintiff has established that the June 15 quit-claim deed constituted an unauthorized, post-petition transfer of estate property, and thus he can avoid the transfer. He also has established that the defendant obtained the transfer of that property in violation of the automatic stay. Accordingly, pursuant to 11 U.S.C. § 551, any property of the estate that the debtor transferred via the quit-claim deed is automatically preserved for the benefit of the estate. The question that remains, however, is what "property of the estate" the debtor improperly transferred to the defendant when she signed the quit-claim deed.

In February 2005, over two years before the debtor filed her Chapter 7 petition, she and the defendant signed the MSA, the terms and provisions of which were incorporated by the divorce court into its March 9, 2005 judgment. One of those terms and provisions stated that the defendant would keep "the marital home." Another of the MSA provisions stated, "The mortgage on the home . . . will be assumed by the [defendant] and titled in his name only." (Ex. 1 at 4, ¶ 4)

In his objection to the motion for default judgment, the defendant argued that the result of the MSA and the judgment of divorce was that the debtor did not retain any legal or equitable interest in the homestead after March 9, 2005. The defendant argued that "[the] Debtor's interest [in the homestead] was waived and divested by the Judgment of Divorce which was approved and accepted by the Family Court on March

15

9, 2005." (Def.'s Mem. in Opp. at 3) Accordingly, the defendant concluded, "the Debtor ha[d] no legal or equitable claim as to the marital residence, as of March 9, 2005. Because the Debtor had no equitable or legal title to the property, the residence was not property of the Bankruptcy Estate, as defined by 11 USC § 541, on [the petition date]." Id. at 4.

At the hearing on the motion for default judgment, the Court asked counsel for the plaintiff to respond to this argument, asking about the impact of the divorce decree on the debtor's interest in the homestead. While maintaining that the June 15, 2007 quit-claim deed was invalid, counsel stated, "I think that all things taken–in other words if there were no transfer in fraud of creditors or anything else I would say [the defendant] is entitled to his real estate." (Electronic Recording of Hearing at 3:00:13 - 3:01:38) Counsel further stated, "I'm saying to you Judge that I think yes, the real estate should be his, but he didn't do the other things he should have and I think until he does I don't think this Court should award him that real estate." (Electronic Recording of Hearing at 3:01:55 - 3:02:09)

These statements indicate that the plaintiff agreed with the defendant that the debtor did not retain any interest in the homestead property at the time she filed her bankruptcy petition in 2007. It is not clear to the Court whether this was, in fact, the case. The plaintiff did not present any evidence regarding whether the MSA or the judgment of divorce were recorded with the Milwaukee County Register of Deeds. Nor did the plaintiff discuss why, if the MSA transferred all of the debtor's interest in the homestead to the defendant in 2005, the defendant felt it necessary to file a motion to

16

compel to obtain her signature on the quit-claim deed in 2007. The Court does not know, therefore, what interest the estate obtained in the homestead as of the June 12, 2007 petition date, or what estate interest the debtor transferred when she signed the quit-claim deed on June 15, 2007.

Regardless of what interest she transferred, however, that transfer constituted an unauthorized, post-petition transfer, and the defendant obtained it by violating the automatic stay. Accordingly, the Court finds that the June 15, 2007 quit-claim deed signed by the debtor is avoidable under 11 U.S.C. § 549(a).

## C. The Plaintiff Has Proven A *Prima Facie* Case for His Third Cause of Action—His Allegation That He is Entitled to Avoid the Transfers Effectuated By the 2005 MSA as Transfers in Fraud of Creditors.

In his third cause of action, the plaintiff alleges that several transfers from the debtor to the defendant that resulted from the 2005 MSA were voidable under state law as transfers in fraud of creditors, and therefore that he can avoid those transfers pursuant to 11 U.S.C. § 544(b)(1). In particular, he alleges that he can avoid under this provision the debtor's transfers through the MSA of her interest in the homestead, her interest in the defendant's retirement accounts and her interest in the defendant's employee savings account. The Court concludes that the plaintiff has made a *prima facie* case for this third cause of action under one theory—that the when the debtor signed the MSA, she effected a "constructive" fraud of her creditors.

17

1. <u>To avoid a transfer under section 544(b)(1), the plaintiff must prove that a creditor holding an allowed, unsecured claim could void the transfer "under applicable law."</u>

Section 544(b)(1) allows a trustee to avoid any transfer of the debtor's interest in property "that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title . . . ." 11 U.S.C. § 544(b)(1). To be able to avoid a transfer under this section, then, the plaintiff must show that (1) there is a creditor holding an allowed, unsecured claim; and (2) that that unsecured creditor could void the transfer under applicable law. "In other words, if any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate." <u>In re Leonard</u>, 125 F.3d 543, 544 (7th Cir. 1997).

More specifically, the Seventh Circuit has explained that

under the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debtor that would be voidable by any actual unsecured creditor under state law. *See In re Leonard,* 125 F.3d 543, 544 (7th Cir.1997). The trustee need not identify the creditor, so long as the unsecured creditor exists.

<u>In re Image Worldwide, Ltd.</u>, 139 F.3d 574, 576-77 (7th Cir. 1998). "In essence, this provision allows a trustee to take advantage of state law with respect to fraudulent conveyances." <u>In re Eckert</u>, 388 B.R. 813, 838 (Bankr. N.D.Ill. 2008).

2. <u>The uncontested facts demonstrate that a creditor holding an allowed, unsecured claim could void the transfer as a constructive fraud under § 242.04(1)(b).</u>

The plaintiff first alleges that by signing the MSA, the debtor effectuated transfers which were fraudulent under Wisconsin's version of the Uniform Fraudulent

18

Transfer Act ("UFTA"). He makes this assertion under three different theories. He first argues that the transfers were fraudulent as to all creditors as actual fraud under § 242.04(1)(a) of the UFTA. He next argues that the transfers were constructively fraudulent as to all creditors under § 242.04(1)(b) of the UFTA. And finally he argues that the transfers were fraudulent as to creditors existing at the time they were made under § 242.05(1). As discussed below, the Court finds that while the uncontested facts do not prove a *prima facie* case of actual fraud under § 242.04(1)(a), or a *prima facie* case of fraud as to existing creditors under § 242.05(1), it finds that those facts do prove a *prima facie* case of constructive fraud under § 242.04(1)(b).

a.    *The elements of Wis. Stat. § 242.04.*

Section 242.04 of Wisconsin's UFTA states:

(1) A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . :

(a) With actual intent to hinder, delay or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

* * * *
2.    Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Wis. Stat. § 242.04(1)

There are two, separate fraudulent transfer theories articulated in § 242.04(1).

Under subsection (1)(a), the plaintiff must prove (1) that the debtor made a transfer

(2) with the actual intent to hinder, delay or defraud any creditor of the debtor. If a plaintiff proves these two elements, then the transfer is fraudulent as to a creditor regardless of whether the creditor's claim arose before or after the debtor made the transfer. This kind of fraudulent transfer sometimes is referred to as "actual fraud," because the transferor intended to defraud his or her creditors.

The second theory, under subsection (1)(b), requires a plaintiff to show (1) that the debtor made a transfer; (2) that the debtor did not receive a reasonably equivalent value in exchange for the transfer; and (3) that the debtor "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Wis. Stat. § 242.04(1)(b)(2). Again, if the plaintiff proves these three elements, the transfer is fraudulent as to a creditor regardless of whether the creditor's claim arose before or after the debtor made the transfer. This kind of fraudulent transfer sometimes is referred to as "constructive fraud," because while the transferor may not have had the intent to defraud the creditors by making the transfer, the surrounding evidence should have led the transferor to believe that the transfer was likely to result in creditors being defrauded.

> b. *By signing the MSA, the debtor effectuated a "transfer," as the Wisconsin statute defines that term, and thus the facts prove the first element of both § 242.04 causes of action.*

Both § 242.04 theories of fraudulent transfer require the plaintiff to prove that the debtor made a "transfer." Section 242.01(12) of the Wisconsin Statutes defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and

includes payment of money, release, lease and creation of a lien or other encumbrance." The defendant does not dispute what seems clear–that when the debtor signed the MSA, she made a "transfer" as defined by § 242.01(12), because in signing the agreement, she made a direct and knowing disposition of her interest in various assets, such as her interest in the homestead. She also made a direct, and apparently unknowing, disposition of other assets, by agreeing that everything in the defendant's possession at the time of the divorce hearing would belong to him–including assets that she did not know were in his possession. The plaintiff, therefore, has proven the first element of both subsections (1)(a) and (1)(b).

> c.    *There is no evidence that the debtor signed the MSA with the actual intent to hinder, delay or defraud any creditor of the debtor, and thus the facts do not prove the second element of a cause of action under § 242.04(1)(a).*

The second element of subsection (1)(a) requires the plaintiff to prove that the debtor transferred her interest with the actual intent to hinder, delay or defraud creditors. In determining whether a debtor had such an intent, the statute advises courts to consider, among other factors, whether:

(a)    The transfer or obligation was to an insider;

(b)    The debtor retained possession or control of the property transferred after the transfer;

(c)    The transfer or the obligation was disclosed or concealed;

(d)    Before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(e)    The transfer was of substantially all the debtor's assets;

21

(f)    The debtor absconded;

(g)    The debtor removed or concealed assets;

(h)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Wis. Stat. § 242.04(2).

Initially, the plaintiff did not address these "badges of fraud." Rather, during the hearing, counsel for the plaintiff stated,

> I'm not saying that [the debtor] here was guilty of actual intent but I think, I think, I apologize because I can't give you a cite on it, but I think the intent can be assumed from the transfer itself. But aside from that I don't even have to worry about that one I can look at 242.04 sub one sub b.

(Electronic Recording of Hearing at 2:16:35 - 2:17:00.)

In response to this assertion, counsel for the defendant stated, "[Plaintiff's counsel] has argued that 'jeez I don't think [Wis. Stat. § 242.04(1)(a)] means that the debtor had actual intent to hinder' but that's exactly what the statute says. The statute says actual intent to hinder." (Electronic Recording of Hearing 2:44:20 - 2:44:31.) The defendant's counsel then discussed the lack of evidence to prove the badges of fraud.

22

With regard to § 242.04(2)(i) (whether the debtor was insolvent or became insolvent immediately after the transfer) and § 242.04(2)(j) (whether the transfer occurred shortly before or after the debtor incurred a substantial debt), counsel noted that although the divorce took place in February 2005, the debtor's bankruptcy schedules showed that she did not incur any debt until October 2005–eight months later. Counsel argued that because the debtor made it eight months without incurring debt that she was incapable of paying, the plaintiff had failed to prove either that the debtor was insolvent at the time of the transfer or became insolvent shortly after the transfer, or that the transfer occurred "shortly before or shortly after" she incurred a substantial debt. (Electronic Recording of Hearing at 2:45:27 - 2:46:26)

It was at this point that the plaintiff began to argue that the badges of fraud weighed in favor of a finding that the debtor entered into the MSA with the actual intent to hinder, delay, or defraud her creditors. He argued (1) that he had proven the factor in subsection (2)(a)–that the debtor made the transfer to an insider (the debtor's ex-husband); (2) that he had proven the factor in subsection (c)–that the transfer was concealed; and (3) that he had proven the factor in subsection (e)–that the debtor had transferred substantially all of her assets. To finish off the argument, he repeated his assertion that, "[a]gain, even if I can't prove intent . . . I certainly can prove [Wis. Stat. Section 242.04(1)(b)] . . . So I don't need the intent." (Electronic Recording of Hearing at 2:57:17 - 2:57:57)

The Court finds that the uncontested facts do not support a *prima facie* case that the debtor signed the MSA with the actual intent to hinder, delay or defraud her

23

creditors. As to the plaintiff's assertion that the Court should assume that intent from the transfer itself–in other words, that the very fact that the debtor signed the MSA demonstrated that she signed it with the intent to hinder, delay or defraud her creditors–the Court disagrees. The plaintiff did not cite any law in support of this assertion, and the assertion flies in the face of the statutory language requiring that he prove "actual" intent.

As to the evidence regarding the badges of fraud, the Court finds that, of the eleven enumerated badges of fraud listed in Wis. Stat. § 242.04(2), the facts support, at best, three. First, the plaintiff is correct that the debtor transferred her assets to an "insider"–her ex-husband. (Wis. Stat. § 242.04(2)(a)) Second, when one considers that in signing the MSA, the debtor gave away her interest in her house and in any assets in her husband's possession, it is possible that she may have transferred away "substantially all" of her assets. (Wis. Stat. § 242.04(2)(e)) Third, as the Court will discuss in more detail later, the debtor did not receive a "reasonably equivalent value" in exchange for the assets she transferred to the defendant through the MSA. (Wis. Stat. § 242.04(2)(h))

But in the Court's view, one must read the badges of fraud in connection with § 242.04(1)(a)'s requirement that the plaintiff prove that the *debtor*–the person who *transferred* the assets–did so with the actual intent to hinder, delay or defraud her creditors. As the Fourth Circuit observed in the context of a § 548 fraudulent transfer action, "[r]egardless of the ability of courts to infer actual fraudulent intent from the presence of 'badges of fraud,' . . . actual fraudulent intent requires a subjective

24

evaluation of the debtor's motive." Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 484 (4th Cir. 1992) (citations omitted). When read in this light, the fact that the debtor transferred her assets to her ex-husband, the fact that she may have transferred the majority of her assets to him, and the fact that she did not receive in return a "reasonably equivalent value," does not look like an intent to defraud creditors–it looks like an intent to leave a bad marriage. And the absence of the other badges of fraud points to a lack of actual intent to defraud. The debtor did not, for example, sign the house over to the defendant in the MSA, and then continue to live in it (which, of course, would have rendered the transfer suspicious). She did not conceal assets.[2] She did not sign the assets over to the defendant immediately on the heels of a lawsuit or the threat of one. She did not transfer the assets and then abscond to avoid creditors who might seek to recover those

---

[2] At the hearing, counsel for the plaintiff argued that the MSA effected a "concealed" transfer, because the *defendant* concealed from the *debtor* the retirement and savings assets he'd pilfered, as well as the fact that the debtor generally was getting the short end of the stick in the property distribution. The plaintiff's attorney stated,

> I think [the transfer] was concealed. I don't know if [the debtor] knew what at all what was going on to her. Certainly according to the OLR report . . . [the retirement funds and the savings account withdrawals] were not discussed in the divorce. They were not given any written indication of. So I think that the transfer was concealed because [the defendant] had possession of all of these assets.

(Electronic Recording of Hearing at 2:56:31 - 2:57:00) But that doesn't prove that the *debtor*–the person who *made* the transfer–concealed the assets with actual intent to defraud *creditors*. Rather, it indicates that the *defendant*–the person who *received* the transfer–concealed assets with what appears to have been actual intent to defraud *the debtor*.

25

assets. She did not remove or conceal assets before signing the MSA–indeed, the OLR and the Wisconsin Supreme Court found that it was the *defendant* who did that, not the debtor. Accepting the uncontested facts as alleged by the plaintiff, there is nothing to demonstrate that the debtor signed the MSA for any reason other than as a mechanism to extricate herself from the marriage.

Finally, the plaintiff's counsel conceded the lack of actual intent at several points during the hearing, informing the Court that he did not need to prove actual intent because he believed he had a strong case under Wis. Stat. § 242.04(1)(b).

For all of these reasons, the Court finds that the plaintiff has failed to make a *prima facie* case of a transfer in defraud of creditors under Wis. Stat. § 242.04(1)(a).

> d. *The uncontested facts demonstrate that at the time she signed the MSA, the debtor reasonably should have believed that she would incur debts beyond her ability to pay as they became due–the third element in a cause of action under § 242.04(1)(b).*

To make a *prima facie* case that the MSA constituted a fraudulent transfer pursuant to Wis. Stat. § 242.04(1)(b)(2), the plaintiff must prove that when the debtor signed the MSA–when she made the "transfer" of the assets to the defendant– she did not receive a reasonably equivalent value in exchange for the transfer, and that she "[i]ntended to incur, or believed or reasonably should have believed that [she] would incur, debts beyond [her] ability to pay as they became due." Wis. Stat. § 242.04(1)(b)(2).

i.    The debtor did not receive a reasonably equivalent value in exchange for the assets she transferred to the defendant by means of the MSA

(A)    **Interpretation of "reasonably equivalent value"**

The Wisconsin version of the Uniform Fraudulent Transfer Act does not define the term "reasonably equivalent value." It *does* define the word "value" as follows: "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." Wis. Stat. § 242.03(1). But it leaves courts to determine, on a case-by-case basis, whether the "value" that a party receives in exchange for a transfer is "reasonably equivalent" to the value the party transferred away. "Reasonable," of course, is in the eye of the beholder. "Equivalent" is, perhaps, somewhat less subjective.

In spite of the fact that the statute does not define the full term "reasonably equivalent value," the Seventh Circuit found some guidance in looking at how the phrase has been interpreted under the Bankruptcy Code. In <u>In re Image Worldwide, Ltd.</u>, 139 F.3d at 577, the court noted that

> the [Uniform Fraudulent Transfer Act] is a uniform act, and it derived the phrase "reasonably equivalent value" from 11 U.S.C. § 548(a)(2). . . . Thus, we can look to interpretations of "reasonably equivalent value" from §548 cases, as well as cases from courts interpreting other states' versions of the UFTA for assistance in predicting

what a state court would decide in a particular factual situation.

The Seventh Circuit, in the context of § 548, has stated that,

> in defining reasonably equivalent value, the court should neither grant a conclusive presumption in favor of a purchaser at a regularly conducted, noncollusive foreclosure sale, nor limit its inquiry to a simple comparison

27

of the sale price to the fair market value. Reasonable equivalence should depend on all the facts of each case.

Bundles v. Baker (In re Bundles), 856 F.2d 815, 824 (7th Cir. 1988). The Court further stated that a "bankruptcy court must, of course, be mindful constantly of the purpose of section 548's avoiding powers–to preserve the assets of the estate." Id. Finally, the court advised bankruptcy courts to "focus on what the debtor received in return for what he surrendered." Id.

Similarly, the Fourth Circuit has held that in a § 548 context,

the proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors. As long as the unsecured creditors are no worse off because the debtor, and consequently the estate, has received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred.

In re Jeffrey Bigelow Design Group, Inc., 956 F.2d at 484.

In line with the Seventh Circuit's holding in Bundles, the bankruptcy court for the Northern District of Illinois noted that "[w]hether a transfer is made for reasonably equivalent value is a question of fact to be determined in light of the facts presented in each particular case," Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.), 121 B.R. 983, 994 (Bankr. N.D.Ill.1990). The court found that "'reasonable equivalence' requires a comparison of the value of what went out with the value of what was received." Id.

> (B)     **Application of that interpretation to the facts of this case**

Viewed in light of the above case law, the uncontested facts in this case demonstrate that the debtor did not receive a "reasonably equivalent value" in

exchange for the assets she transferred to the defendant by means of the MSA. The MSA provided that the defendant would retain "everything" in his possession "at the time of the hearing including all personal property, financial assets and the marital home." (Ex. 1 at 4, ¶ IV) It provided that the debtor would retain "everything" in her possession "at the time of the hearing including all personal property and financial assets." (Ex. 1 at 4, ¶ 4) It provided for each party to be responsible for his or her own medical health care expenses. (Ex. 1 at 4, ¶ II) It provided for the debtor to remain the beneficiary of the defendant's life insurance policy. (Ex. 1 at 4, ¶ III) Finally, it provided for the defendant to pay maintenance to the debtor, in the form of $500 per month or 30% of the defendant's monthly income. (Ex. 1 at 4, ¶ I)

As a result of signing the MSA, then, the debtor transferred away her one-half interest in the homestead. Because the agreement provided for each party to retain whatever financial assets were in their possession at the time of the divorce hearing, the debtor also transferred away—apparently unknowingly—her interest in certain of the defendant's retirement funds and savings accounts.[3] As discussed in the facts, the OLR investigation revealed that the defendant had, prior to the divorce, (1) removed

---

[3] Because the defendant omitted reference to the retirement funds and savings accounts during the divorce, it appears that neither the MSA nor the resulting divorce judgment dealt with these assets. Wisconsin law provides that if a marital property asset is omitted from a divorce decree for any reason, the spouses continue to own that asset as tenants in common after the dissolution of the marriage. *See* Wis. Stat. Section 766.75; 3 Keith A. Christiansen, et al., Marital Property Law in Wisconsin, section 11.21 (2004). Even if the MSA did not constitute a fraudulent transfer, then, it appears that at the time she filed her bankruptcy petition, the debtor retained an interest in the undisclosed assets as a tenant in common.

29

$110,000 from his employee savings plan, some $80,000 of which he still had in his possession at the time of the divorce; and (2) withdrawn $303,261.81 from his retirement accounts. (Ex. 2 at 11, ¶ 14 and 17)

In exchange, the MSA mandated that the debtor would receive maintenance in the sum of "$500 per month or, in the alternative 30% of [the defendant's] monthly income." (Ex. 1 at 4, ¶ I.) According to plaintiff's counsel, the debtor had in her possession at the time of the divorce hearing, and therefore retained under the MSA, a 1991 vehicle. (Electronic Recording of Hearing at 2:14:30 - 2:14:40; 2:55:45 - 2:55:56) The OLR investigation report indicated that the defendant had told the investigator that he had given the debtor "$8,000.00 - $9,000.00" of the money he had withdrawn from the employee savings plan, and that the debtor "had approximately $15,000.00 to $17,000.00 worth of credit card bills which were paid off from the [employee savings plan] money." (Ex. 2 at 11, ¶ 14.) (The Court has no evidence regarding whether the defendant's assertion to the OLR investigator was true.)

So in exchange for her half-interest in the homestead, her half-interest in the $80,000 left in from the savings account, her half-interest in whatever the defendant retained of the $303,000 he withdrew from his retirement accounts, and her half-interest in whatever other assets the defendant had in his possession at the time of the divorce hearing, the debtor received maintenance of $500 per month, a fourteen-year-old car, and *possibly* $23,000 to $26,000 in cash and/or repaid credit card debt. Did this constitute "reasonably equivalent value?" While it cannot calculate with precision

30

the value of the assets the debtor transferred to the defendant, the Court concludes that the answer is no.

Neither the MSA nor the divorce decree make any reference to the value of the homestead. The plaintiff does not mention it in the complaint or in his motion for default judgment. Neither those portions of the OLR investigator's report that were admitted into evidence nor the Wisconsin Supreme Court's decision make reference to the value of the homestead. The Court, therefore, has no evidence regarding the value of the interest the debtor transferred when she transferred to the defendant her one-half interest in the homestead.

With regard to the employee savings account, in signing the MSA, the debtor unknowingly transferred to the defendant her interest in half of the $80,000 that remained in his possession at the time of the divorce–$40,000. With regard to the retirement funds, the debtor unknowingly transferred to the defendant her half-interest in whatever remained of the $303,000 he withdrew before the divorce. The OLR investigator's report indicated that the defendant had rolled $158,000 of this amount into a new retirement account, had retained approximately $27,000 for paying taxes, and had taken the remaining $118,000 or so for himself and never accounted for it. (Ex. 2 at 17) Arguably, then, the debtor transferred away an interest in half of the $158,000 that went into a new retirement account and half of the un-accounted-for $118,000–a total interest of some $138,000.[4]

_____

[4] At various points in his pleadings and at the hearing, the plaintiff also referred to the defendant having failed to honor an agreement to give the debtor a

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 31 of 45

Based on these facts, the Court can conclude that the debtor transferred away interests valued at a minimum of $178,000, and that her half-interest in the marital home would have increased that amount. On the basis of the dollar amounts alone, a transfer that results in the exchange of interests worth in excess of $178,000 for a 14-year-old car, a monthly payment of $500, and possibly, although not definitely, a cash payment of some $23,000 to $26,000, does not appear to this Court to be an exchange for "reasonably equivalent value." Certainly the Wisconsin Supreme Court did not think so. It concluded that the MSA was a "patently unfair divorce agreement." In re Disciplinary Proceedings Against Gamino, 753 N.W.2d at 527-28. Undoubtedly from the perspective of the creditors in this bankruptcy case, such an exchange was not one of "reasonably equivalent value."

There are, of course, further facts to consider. The surrounding facts imply that the transfer was not an "arms-length" transaction. The debtor was the petitioner in the divorce, so it appears that she was the one seeking to exit the marriage. That gives rise to an inference that the defendant, as the person with the power to grant the debtor what she sought, would have had greater leverage in negotiating the division

---

lump-sum payment of $98,000. (Electronic Recording of Hearing at 2:22:22-2:22:47; Pl.'s Aff. In Support of Default Judgment at paragraph 6) He appears to derive this figure from the OLR investigator's report, which indicates that there was a "Joint Financial Disclosure Statement dated April 24, 2004," which indicated that the defendant would pay the debtor $98,000 from his "pension." (Ex. 2 at 17) The Court does not have a copy of this disclosure statement, and has no way of knowing whether this $98,000 was part of the pension from which the defendant admitted withdrawing $303,000 pre-divorce. Accordingly, the Court is not including this amount in its calculations.

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 32 of 45

of assets.  And as discussed in the facts section above, both the OLR investigator and the Wisconsin Supreme Court concluded that by the time the case was over, the defendant had the full cooperation and assistance of divorce counsel, while the debtor had no one acting in her interests.  The OLR report and the Wisconsin Supreme Court decision indicate that the defendant basically hid assets from the debtor, in order to increase the assets in his possession and decrease the assets in the debtor's possession prior to the divorce hearing.  These facts, like the bare dollar amounts, point toward the conclusion that the debtor did not receive a "reasonably equivalent value" in exchange for the transfer.

The Court concludes, therefore, that the plaintiff has met his burden of proving the second element of a constructively fraudulent transfer under Wis. Stat. § 242.04(1)(b).

> ii.   The uncontested facts demonstrate that when the debtor signed the MSA, she reasonably should have believed that she would incur debts beyond her ability to pay as they became due.

The final element that the plaintiff must prove to prove constructive fraud under § 242.04(1)(b) is that the debtor "[i]ntended to incur, or believed or reasonably should have believed that [she] would incur, debts beyond [her] ability to pay as they became due."  In order for the plaintiff to prove this third element of constructive fraud, the uncontested facts must show that at the time she signed the MSA in 2005, the debtor either intended to incur, or reasonably should have believed that she would incur, debts beyond her ability to pay as they became due.  The Court does not believe, and

the plaintiff has not asserted, that the facts show that the debtor intended to incur debts beyond her ability to pay at the time she signed the MSA. Rather, the plaintiff argues that the circumstances at the time of the divorce gave the debtor reasonable cause to believe that she would incur debts beyond her ability to pay. To determine whether the facts demonstrate this, the Court must look at the debtor's financial situation as of the time she signed the MSA.

In arguing that the facts proved this element, the plaintiff stated that, at the time of the divorce, the debtor had no income. (Electronic Recording of Hearing at 2:17:16 - 2:17:21.) The plaintiff's counsel argued at the hearing that

> At the time of the bankruptcy here she's receiving Social Security disability. By the way, she was, as I understand it, disabled at the time of the divorce too. She has no income at the time of the bankruptcy filing, she has social security and I believe, uh, [the defendant] pays her approximately five, five or seven hundred dollars a month on maintenance. So I believe, says her social security is four sixty two and then [the defendant] does pay her some maintenance. I think it's seven, seven fifty or something, whatever a month, but there's some amount that he does pay. And it's quite obvious that she didn't have the ability to pay her debts as they became due. She has creditors in existence now, because it's impossible to pay, or to live on, the type of income that this woman has, what she was left with in this case.

(Electronic Recording of Hearing at 2:17:22 - 2:18:26.)

The Milwaukee County Circuit Court file stamp on the MSA indicates that it was filed on February 3, 2005, so the debtor must have signed it sometime prior to that date. (Ex. 1 at 4) On February 3, 2005, the agreement guaranteed that the defendant would pay the debtor *either* $500 per month *or* 30% of his monthly income as maintenance, starting May 2005. (Ex. 1 at 4, ¶ I) The Court does not know what the

34

defendant's monthly income was as of May 2005, but his 2004 W-2 attached to the tax return admitted as Exhibit 3 in this case indicates that in 2004, his annual salary was $19,344.42. (Ex. 3) Assuming he received the same income at the time the MSA's maintenance provisions were to kick in in 2005, he would have received income of roughly $1,612.35 per month. Thirty percent of that monthly amount would have come to around $483.00 per month. So one way or the other, at the time the debtor signed the MSA in February 2005, she had a basis for expecting that she would be receiving approximately $500 a month in maintenance.

The debtor's Schedule I reflects that in 2007, she received Social Security disability payments of $462 per month. The Court does not know whether she was receiving that same amount in 2005, at the time she signed the MSA, so for lack of any other information, the Court must use that amount in calculating the income the debtor might have anticipated she'd be receiving after the divorce.

Adding the two amounts together–the $500 per month that she could expect in maintenance and the $462 per month (or less) that she could expect in Social Security disability payments–it appears that at the time she signed the MSA in February 2005, the debtor reasonably could have expected to receive monthly income in the neighborhood of $962 or less. Annualized, this comes to $11,544 or less per year. The 2005 federal poverty guideline for a one-person household was $9,570. Annual Update of the HHS Poverty Guideline, 70 Fed. Reg. 8373, 8374 (Feb. 18, 2005)

During the OLR investigation, the defendant asserted that he paid all of the debtor's credit card debt in full prior to the divorce. (Ex. 2 at 11, ¶ 14.) This Court has

no evidence to contradict that assertion. It appears, therefore, that at the time the debtor signed the MSA, she did not have any outstanding credit card debt.

The uncontested facts indicate that before she signed the MSA, the debtor–although disabled and unemployed–co-owned her own home, was supported by half of her employed husband's income and her own disability payments, and had a half-interest in all of her husband's savings and retirement funds. The uncontested facts also indicate that after she signed the MSA, the debtor–disabled and unemployed–owned no real estate, owned no assets other than a 14-year-old car, and had to support herself on income that put her only slightly above the federal poverty guideline. This change constituted a drastic reduction in lifestyle and resources, particularly for a person on a fixed income. Should such a drastic change in her circumstances as that effectuated by the MSA reasonably have led her to believe that she would incur debts beyond her ability to pay in the foreseeable future? The Court concludes that it should have.

At the hearing, counsel for the defendant argued that, while the debtor's post-divorce income was meager, she nonetheless had managed to make it for some seven or eight months post-divorce without incurring any credit card debt. He further argued that she made it two-and-a-half years until she had to file for bankruptcy. And he argued that the defendant actually paid the debtor over $700 per month in maintenance, not the $500 specified in the MSA.

But the third element of constructive fraud under § 242.04(1)(b) asks whether the debtor reasonably should have believed–*at the time she made the transfer*–that

36

she'd incur debts beyond her ability to pay. This Court, therefore, must look at what the debtor knew at the time she signed the MSA, and at the conclusions she reasonably should have drawn from what she knew at that time. The debtor presumably could not see into the future. She could not know that, while the MSA guaranteed her maintenance of $500 per month, the defendant would pay her more than that in the future. All she knew at that time was that the MSA promised her $500 per month or 30% of the defendant's income, and that she could expect to continue to receive her disability payments. As the Court has indicated, this gave the debtor reason to believe that she would have to live on around $962 per month, or less, in the foreseeable future.

She would have to feed, clothe and house herself on this amount. She would have to pay her own medical expenses from this amount–and while the Court does not know the nature of the debtor's disability, the Court suspects that that disability might give rise to medical expenses of some sort. She would have to maintain a 14-year-old vehicle on that amount. Impossible? No–as counsel for the defendant argued at the hearing, it is an unfortunate truth that many people manage to take care of themselves on such meager sums, or less. But again, the statute does not require the Court to determine that the debtor knew that she would incur debts she could not pay–only that she reasonably should have believed as much.

The Court concludes that the severe reduction in the debtor's circumstances and assets worked by the transfers she made through the MSA, coupled with her inability to work, should reasonably have led the debtor to believe that she would incur debts

she could not pay as they became due. And therefore, the Court concludes that the uncontested facts prove a *prima facie* case of constructive fraud under § 242.04(1)(b).

> E. *The uncontested facts do not prove that a creditor holding an allowed, unsecured claim could void the transfer under § 242.05(1).*

The plaintiff asserted a third fraudulent transfer theory, arguing that by signing the MSA, the debtor effectuated transfers which were fraudulent under Wis. Stat. § 242.05. Although the Court has found in the plaintiff's favor on his second fraudulent transfer theory, and therefore finds that default judgment in his favor is appropriate on that theory, the Court notes that the uncontested facts do not support the plaintiff's third fraudulent transfer theory.

Wis. Stat. § 242.05(1) states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

In In re Kirchner, Judge Martin held that reading Wis. Stat. § 242.05(1) together with 11 U.S.C. § 544(b)(1) resulted in a trustee being permitted to

> avoid a pre-petition transfer of property if: (1) the debtor had an unsecured creditor at the time of the transfer who was still an unsecured creditor at the time of the bankruptcy filing; (2) the debtor did not receive a reasonably equivalent value in exchange for the transfer; (3) the debtor transferred an interest that the debtor had in the property; and (4) the debtor was insolvent at the time of (or was rendered insolvent by) the transfer.

In re Kirchner, 372 B.R. 459, 461-62 (Bankr. W.D.Wis. 2007)

38

As discussed above, the Court already has concluded that the debtor did not receive a "reasonably equivalent value" for the interests she transferred to the defendant when she signed the MSA. Thus, the questions the Court must answer regarding the plaintiff's third fraudulent transfer theory are (1) whether, at the time she filed her bankruptcy petition in 2007, the debtor had an unsecured creditor whose claim arose prior to the February 2005 signing of the MSA, and (2) whether the debtor either was insolvent as of the February 2005 transfer, or became insolvent as a result of that transfer. The Court concludes that under the uncontested facts, there was not an unsecured creditor in existence at the time of the bankruptcy whose claim arose prior to the transfer.

The plaintiff argued at the hearing that the Internal Revenue Service ("IRS") was an unsecured creditor whose claim arose before the transfer was made. The uncontested facts show that the debtor and the defendant filed a joint federal income tax return in 2004. (Ex. 3) The IRS determined that for that tax year, they owed an amount in addition to the amount withheld from their income. (Ex. 4.) The 2004 tax year concluded, obviously, prior to the February 3, 2005 transfer.

The plaintiff argued that the additional tax liability was due and owing as of January 1, 2005, and thus that the IRS was a creditor whose claim was in existence at the time of the MSA transfer on February 3, 2005. Counsel for the plaintiff argued that "at the time of the divorce this [IRS] debt was owing. It was for the '04 tax return period - after January first of '05 that is owing so there is a creditor in existence." (Electronic Recording of Hearing at 2:13:27 - 2:13:39.)

39

Counsel for the defendant responded by arguing that the couple's accountant completed and sent the 2004 tax return to them on October 15, 2005 - after the divorce was granted.  (Electronic Recording of Hearing at 2:35:21-2:35:36, Ex. 3.)  Counsel argued that because the couple asked to extend the time to file, they did not file the return until after the divorce was granted.  (Electronic Recording of Hearing at 2:35:21-2:36:05)  Therefore, counsel argued, the debt was not in existence at the time of the divorce.  (Electronic Recording of Hearing at 2:35:21-2:36:05)

Counsel for the plaintiff disagreed.  He argued,

> The taxes is [sic] a liability as of January first 2005.  It doesn't make a difference that they filed an extension to file the return or not or that the taxes were paid in December of 2006.  As of the date of that divorce under 242.05 sub 1 there was a creditor in existence and it was the IRS.

(Electronic Recording of Hearing at 2:55:12 - 2:55:39.)

To determine whether the IRS was a creditor whose claim was in existence on February 3, 2005, the Court turns to the Internal Revenue Code.  Section 6151(a) of Title 26 states:

> [W]hen a return of tax is required under this title or regulations, the person required to make such return shall .  .  .  pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return (determined without regard to any extension of time for filing the return).

Subsection (c) of that provision goes on to state that

> [i]n any case in which a tax is required to be paid on or before a certain date .  .  .  any reference in this title to the date fixed for payment of such tax shall be deemed a reference to the last day fixed for such payment (determined without regard to any extension of time for paying the tax).

40

Section 6072(a) of the tax code dictates the date upon which a taxpayer must file the return:

> (a) General rule.--In the case of returns under section . . . 6013 . . ., returns made on the basis of the calendar year shall be filed on or before the 15th day of April following the close of the calendar year and returns made on the basis of a fiscal year shall be filed on or before the 15th day of the fourth month following the close of the fiscal year . . . .

(Section 6013 authorizes the filing of joint returns of income tax by husband and wife.)

Read together, these provisions indicate that a husband and wife filing a joint return which is made based on the calendar year must file that return on or before April 15 of the year following the close of the calendar year, and must pay any tax they owe as of that date. Several courts have concluded that this means that the tax liability–the debt–matures on the day the taxpayers are required to file the return.

In U.S. v. Thomassen, 610 F.Supp. 386, 392 (D.Neb. 1985), the Nebraska district court, quoting the Eighth Circuit, stated that:

> "[B]y the terms of the Internal Revenue Code [26 U.S.C. Section 6151 (1954) ] income tax *liability* matures on the day the return is required to be filed, and the *correct amount* of tax liability becomes *due* at that time, regardless of when the deficiency assessment may be made [citations omitted, emphasis in original]." Hartman v. Lauchli, 238 F.2d 881, 887 (8th Cir.1956) (reh'g denied), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1048, 1 L.Ed.2d 915 (1957).

The district court for the Northern District of Georgia reached a similar conclusion in Federal Deposit Ins. Corp. v. U.S., holding that

> [u]nder Section 6151 of the Internal Revenue Code, regardless of when federal taxes are actually assessed, the

41

taxes are considered as due and owing, and constitute a liability as of the date the tax return for the particular period is required to be filed. *United States v. Ressler*, 433 F.Supp. 459, 463 (S.D.Fla.1977), aff'd 576 F.2d 650 (5th Cir.1978), cert. denied, 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979); *United States v. Adams Building Company*, 531 F.2d 342 (6th Cir.1976); *United States v. Hickox*, 356 F.2d 969 (5th Cir.1966); *Hartman v. Lauchli*, 238 F.2d 881 (8th Cir.1956), cert. denied, 353 U.S. 965, 77 S.Ct. 1048, 1 L.Ed.2d 915 (1957).

654 F.Supp. 794, 806-807 (N.D.Ga. 1986).

Applying the statutes and the case law discussed above to the facts of the present case, the Court concludes that the additional tax liability the debtor and the defendant owed for 2004 did not mature until April 15, 2005. The debtor and defendant filed a joint tax return, as allowed under 26 U.S.C. section 6013(a). Section 6072(a), which dictates when a return is due, applies to returns filed under § 6013(a), so § 6072(a) governed the date upon which the couple's return was due. The debtor and defendant stated on the 2004 return that the return was for the tax year January 1, 2004 through December 31, 2004, (Ex. 3), thus indicating that their return was based on a calendar year. Under § 6072(a), then, the due date for their return was April 15 of the following year–April 15, 2005. Pursuant to § 6151 and the cases discussed above, that is when their 2004 tax liability matured–on April 15, 2005. Accordingly, the IRS did not have a claim for that debt until April 15, 2005, and was

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 42 of 45

not a creditor whose claim was in existence when the debtor signed the MSA on or before February 3, 2005.[5]

Because the uncontested facts do not provide sufficient evidence to prove a *prima facie* case for the first element of a claim under Wis. Stat. § 242.05, the Court will not discuss the remaining element of that claim.

### III. <u>CONCLUSION</u>

As discussed above, the Court concludes that the June 15, 2007 quit-claim deed the debtor signed constituted an unauthorized, post-petition transfer of estate property, and finds that as such, it is avoidable under 11 U.S.C. § 549(a). The Court also finds that when the debtor signed the February 3, 2005 MSA (later incorporated

---

[5] The defendant also argued that he had paid the 2004 tax liability prior to the bankruptcy, such that the IRS no longer was a creditor at the time the debtor filed her petition. He argued,

> There was tax liability; however, that liability has been paid. So if [the plaintiff is] . . . coming in and saying wait a minute Judge we've defrauded all of these creditors because they transferred all this property in February of '05 I say what creditor . . . is being defrauded? The only creditor that was in existence at that time has been paid. The IRS has not been defrauded at all. They were paid in full by [the defendant].

(Electronic Recording of Hearing at 2:36:05 - 2:36:43.) If true, this assertion further supports the Court's conclusion–not only was the IRS not a creditor to whom the debtor owed a debt at the time of the transfer in February 2005, but also the IRS was not a creditor to whom the debtor owed the debt when she filed her petition in 2007.

Case 08-02056-pp    Doc 30    Filed 06/18/09    Page 43 of 45

by the family court commissioner into the March 9, 2005 divorce judgment), she effectuated a transfer in constructive fraud of her creditors under Wis. Stat. § 242.04(1)(b), and therefore finds that that transfer is avoidable under 11 U.S.C. § 544(b)(1). The Court finds that as a result of these avoidable transfers, the plaintiff can avoid the debtor's transfer of her one-half interest in the marital home, her one-half interest in the $80,000 the defendant had in his possession from his employee savings account, and her one-half interest in the funds the defendant withdrew from his retirement accounts pre-divorce.

Pursuant to 11 U.S.C. § 550(1), the plaintiff may recover, for the benefit of the estate, either this property or its value from the defendant (the initial transferee). As discussed previously, the plaintiff appears to have abandoned his demand for transfer of the homestead property itself. Rather, it appears that the plaintiff is seeking to recover the value of the transferred property—the value of the debtor's one-half interest in the homestead and the cash. While the plaintiff has valued the one-half interest in the employee savings funds at $40,000, and the one-half interest in the cash disbursement from the retirement funds at $59,215.50, nowhere has he asserted a value for the debtor's one-half interest in the homestead.

The Court further notes that if, in fact, the plaintiff is seeking to recover the value of the debtor's interest in the homestead, rather than the interest itself, case law indicates that he is entitled to recover the value of that property as of the time of the transfer. *See*, *e.g.*, Kepler v. Security Pacific Housing Services (In re Kepler), 183 B.R. 171, 176-77 (Bankr. W.D. Wis. 1995); Gennrich v. Montana Sport U.S.A., Ltd. (In re

44

<u>International Ski Service, Inc.)</u>, 119 B.R. 654, 658-59 (Bankr. W.D. Wis. 1990).  As indicated above, the transfer took place in February of 2005.

Accordingly, the Court will contact the parties to schedule a further hearing in this matter, to determine the value of the property which the plaintiff may recover on behalf of the estate.  Upon conclusion of that hearing, the Court will enter an order of judgment consistent with this decision.

# # # # #